IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Anthony H. Hix, | ) | C/A No.: 1:16-1252-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

A.      Procedural History

On August 14, 2012, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on April 1, 2010. Tr. at 187–90 and 191–97. His applications were denied initially and upon reconsideration. Tr. at 132–35, 136–39, 144–45, and 146–

47. On August 7, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Jerry W. Peace. Tr. at 35–65 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 31, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 22, 2016. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 42. He completed high school. *Id.* His past relevant work ("PRW") was as a maintenance technician and a production operator. Tr. at 60. He alleges he has been unable to work since April 1, 2010. Tr. at 187.

        2.    Medical History

Plaintiff was hospitalized from July 11 to July 18, 1995, for crisis intervention and medical stabilization, after expressing active suicidal thoughts. Tr. at 618. He had recently separated from his wife. Tr. at 620. He reported eating poorly, losing weight, having difficulty sleeping, and exhibiting anger and irritability at work. *Id.* He endorsed a history of unhappiness, substance abuse, and difficulty handling stress. Tr. at 618. His diagnoses included major depression, a history of substance abuse, and mixed personality disorder. *Id.*

On June 1, 2009, Plaintiff presented to P. Sean McCallum, M.D. ("Dr. McCallum"), with pain and weakness in his right shoulder. Tr. at 614. He reported that he developed the pain after slipping from a ladder the prior week. *Id.* Dr. McCallum observed Plaintiff to have full passive range of motion ("ROM") of the right shoulder, but marked weakness with supraspinatus testing. *Id.* He assessed a probable rotator cuff tear and referred Plaintiff for an MRI. *Id.* On June 10, 2009, Dr. McCallum noted that the MRI of Plaintiff's right shoulder revealed a very high-grade partial thickness supraspinatus tear. Tr. at 612. He discussed possible operative arthroscopy and rotator cuff repair, and Plaintiff opted to proceed with the surgery. *Id.*

Plaintiff underwent right shoulder arthroscopy with debridement of an anterior glenolabral tear and arthroscopic rotator cuff repair on June 30, 2009. Tr. at 520–21. Dr. McCallum noted Plaintiff's incisions were healing and that he was making good progress toward recovery on July 6, July 27, and August 24, 2009. Tr. at 604–06. On September 21, 2009, Dr. McCallum indicated Plaintiff as doing quite well and had full active ROM, near-symmetric strength, and minimal pain. Tr. at 603. He released Plaintiff to return to work without restrictions and instructed him to follow up as needed. *Id.*

Plaintiff presented to Medi Urgent Care of Seneca on December 21, 2010, with high blood pressure, low back pain, shortness of breath, and occasional chest pain. Tr. at 597. The attending physician prescribed Lisinopril and Ziac for hypertension and Ultracet for pain. *Id.*

Plaintiff presented to Tauqueer S. Alam, M.D. ("Dr. Alam"), to establish treatment on January 19, 2011. Tr. at 598–99. He complained of coughing, wheezing, dyspnea on

3

exertion, and occasional chest discomfort. Tr. at 598. He endorsed significant back pain that radiated into his left buttock. *Id.* He stated he had difficulty walking straight and bending over and indicated Ultracet failed to relieve his pain. *Id.* Dr. Alam referred Plaintiff for an MRI, nerve conduction studies, and a cardiolite stress test. Tr. at 599. He prescribed Vicoprofen, Simvastatin, and a vitamin D supplement and advised Plaintiff to discontinue use of tobacco. *Id.*

On April 21, 2011, Plaintiff reported persistent, worsening back pain and intermittent numbness in his left leg. Tr. at 356. He stated his pain had started a few of months earlier, after he pushed his neighbor's wheelchair out of the woods. *Id.* LeRoy Snead, PA ("Mr. Snead"), noted that "with his chronic pain he is starting to feel more depressed which is only aggravating the pain." *Id.* He described Plaintiff as having a slightly antalgic gait. *Id.* Dr. Alam prescribed Baclofen for muscle spasms, Vicoprofen for pain, and Cymbalta for adjustment disorder with depression. Tr. at 357.

Plaintiff reported nasal congestion, cough, dyspnea on exertion, and wheezing on May 19, 2011. Tr. at 351. He complained of pain from his neck to the bottom of his back. *Id.* He described his pain as "very minimal," sharp, and intermittent. *Id.* Plaintiff indicated he did not notice the pain while engaging in activities, but only after completing them. *Id.* Tamara D. Griffis, PA-C ("Ms. Griffis"), observed Plaintiff to have pinpoint tenderness over the thoracic and lumbosacral spine. Tr. at 352. She referred Plaintiff for magnetic resonance imaging ("MRI") of his thoracic and lumbar spine; increased Simvastatin and added Slo-Niacin for hyperlipidemia; recommended Citirizine for allergies; and increased Lortab from 7.5 to 10/500 milligrams for pain. Tr. at 353–54.

4

On June 3, 2011, an MRI of Plaintiff's thoracic spine showed diffuse idiopathic skeletal hyperostosis; diffuse mid and lower thoracic disc degeneration; moderate midline disc protrusion at T4-5; and posterior disc displacement at C5-6. Tr. at 299. An MRI of Plaintiff's lumbar spine indicated acute edema within the anterior aspects of the T12 and L1 vertebral bodies; mild L2-3 disc bulge without herniation; and diffuse lumbar facet and ligamentous changes. Tr. at 299–300.

Plaintiff presented to Oconee Medical Center on July 16, 2011, with complaints of stomach pain and vomiting blood. Tr. at 306. He was hospitalized for three days. Tr. at 308. Timothy McPherson, M.D. ("Dr. McPherson"), diagnosed peptic ulcer disease, positive Helicobacter pylori, acute blood loss anemia, acute renal failure, leukocytosis, hypertension, hyperlipidemia, and chronic pain syndrome. *Id.* He noted that most of Plaintiff's impairments were controlled or stabilized by the time of discharge. *Id.*

Plaintiff followed up with Ms. Griffis on July 28, 2011. Tr. at 350. He denied abdominal discomfort, emesis, black stools, dizziness, and shortness of breath. *Id.* Ms. Griffis noted that Plaintiff's blood pressure was elevated and that he needed to resume use of his blood pressure medications. *Id.* Plaintiff reported difficulty sleeping, and Ms. Griffis prescribed Amitriptyline. *Id.* She also prescribed Ultram to be taken in addition to Lortab for pain. *Id.*

On September 14, 2011, Plaintiff reported that he was doing well overall, but had noticed burning pain in his stomach after taking Cymbalta. Tr. at 346. Ms. Griffis indicated Plaintiff's blood pressure was significantly elevated at 180/112. *Id.* Plaintiff stated he was occasionally taking an additional dose of Lortab to address increased pain

5

during the night. *Id.* He indicated Amitriptyline had provided no relief for his nighttime symptoms. Tr. at 347. Ms. Griffis observed him to have some paravertebral tenderness at L4 through S1. *Id.* Dr. Alam increased Plaintiff's Lortab dosage from three to four tablets per day; discontinued Cymbalta; prescribed Lamictal and Coreg; increased the dosage of Elavil; and referred Plaintiff for blood work and a renal artery study. Tr. at 348–49.

On September 27, 2011, an MRI of Plaintiff's abdomen showed no renal artery stenosis or renal or adrenal mass lesions, but indicated distal aortic and common iliac artery atherosclerosis. Tr. at 362.

Ms. Griffis and Dr. Alam increased Plaintiff's dosage of Coreg to address his elevated blood pressure on October 27, 2011. Tr. at 345. They refilled Plaintiff's prescriptions for Lisinopril, Vitamin B12, and iron. Tr. at 346. They discontinued Simvastatin and prescribed Crestor for hyperlipidemia. *Id.* They encouraged Plaintiff to stop smoking. *Id.*

Plaintiff reported sinus drainage, shortness of breath, wheezing, dizziness, and lightheadedness on January 31, 2012. Tr. at 335. Ms. Griffis indicated Plaintiff was hypotensive and had poor air entry. *Id.* Dr. Alam administered a nebulizer treatment, ordered intravenous fluids, prescribed Septra DS, and indicated Plaintiff should follow up for an echocardiograph ("echo") and stress cardiolite test. Tr. at 335.

On February 6, 2012, an echo showed Plaintiff to have mild concentric left ventricular hypertrophy, mild mitral regurgitation, mild tricuspid regurgitation, normal left ventricular function, normal chamber sizes, no thrombus, and no pericardial effusion.

Tr. at 358. A carotid duplex ultrasound indicated 10–15% stenosis in the bilateral common carotid arteries. Tr. at 360.

On February 21, 2012, Plaintiff reported that he had been experiencing a little more back pain. Tr. at 331. Ms. Griffis noted that Plaintiff had poor posture and stated that she "suspected this is the main reason for his back pain." *Id.* She observed him to have some paravertebral tenderness in his thoracic and lumbar spine. Tr. at 332. She stated Plaintiff had some dyspnea on exertional and occasional wheezing due to cigarette smoking. *Id.* She advised Plaintiff to practice good posture and to engage in dietary control and weight loss. Tr. at 331. Plaintiff reported that he was walking a quarter of a mile daily, and Ms. Griffis encouraged him to increase his walking distance. *Id.*

Ms. Griffis observed Plaintiff to have some paravertebral tenderness and tense muscles in his lumbar and thoracic spine on June 13, 2012. Tr. at 329. Dr. Alam increased Plaintiff's dosage of Lamictal for bipolar disorder and pain; referred him to physical therapy; and instructed him to follow up regarding lab test results in two to three weeks. Tr. at 330.

On July 13, 2012, Plaintiff reported that Lortab continued to take the edge off of his back pain, but was no longer working as well as it had in the past. Tr. at 323. Ms. Griffis observed Plaintiff to have paravertebral tenderness in his lumbar and cervical spine and occasional muscle spasm. Tr. at 324. She recommended Plaintiff engage in home exercises because his insurance carrier failed to approve physical therapy. Tr. at 323. She stated Dr. Alam may consider referring Plaintiff to a neurologist if walking and weight loss did not improve his symptoms. *Id.* Plaintiff continued to report some

shortness of breath, but Ms. Griffis observed that he continued to smoke ten cigarettes per day. *Id.* Ms. Griffis noted that Plaintiff "did have an episode recently at work where he got dizzy and had to stoop down" and that "he was let go from his job secondary to this." *Id.* She recommended Plaintiff monitor his blood pressure. *Id.*

Plaintiff presented to David N. Holt, M.D. ("Dr. Holt"), for a consultative examination on October 11, 2012. Tr. at 452–61. He complained of impairments to his low back and hips, a psychiatric disorder, and chronic obstructive pulmonary disease ("COPD"). Tr. at 452. He stated his pain was exacerbated by moving quickly or lifting in excess of 15 pounds. Tr. at 453. He indicated he had an average of one panic attack per month and could control his panic attacks by avoiding crowds. *Id.* He reported his sleep was disturbed and that he typically slept for five hours per night. *Id.* He stated his breathing problems were exacerbated by exercise, extreme heat, and fumes. *Id.* Dr. Holt observed Plaintiff to have a mildly antalgic gait; to walk slowly and stiffly; to take short steps; and to place more weight on his right side. Tr. at 455. He observed Plaintiff to have 3+ tenderness at L1-2 and on the left at S1 and 4+ tenderness at L3-4 and L4-5. Tr. at 456. A straight-leg raising test was positive at 15 degrees. *Id.* Dr. Holt indicated Plaintiff had decreased response to light touch in his left lateral foot and medial, anterior, and lateral thigh. Tr. at 457. He noted Plaintiff demonstrated a fine tremor in his bilateral upper extremities, but Plaintiff stated the tremor only appeared when he was stressed. Tr. at 456–57. Dr. Holt's diagnostic impressions were degenerative joint disease and likely degenerative disc disease of the spine, worst in the lumbar area; bipolar disease with anxiety and reported post-traumatic stress disorder ("PTSD"); COPD; hypertension;

8

morbid obesity; and carpal tunnel syndrome. *Id.* He indicated Plaintiff was capable of self-care; could stand 15 minutes and walk 300 yards at a time; could sit for up to 40 minutes at a time; could lift 15 pounds and could carry the weight for 10 yards; could perform minor amounts of household chores; and could climb six steps with a handrail. *Id.* He stated Plaintiff had normal grip, but that his gross manipulation was hindered by low back pain. Tr. at 457–58. He indicated Plaintiff had a negative Tinel's sign bilaterally, but a positive Phalen's sign on the right. Tr. at 458. He noted Plaintiff had mild losses of ROM. *Id.* X-rays of Plaintiff's lumbar spine showed syndesmophytes of the lumbar spine and lower thoracic spine and joint space narrowing of the bilateral hips that was greater on the left. Tr. at 450. The findings "raise[d] the possibility for a seronegative spondyloarthropathy." *Id.* The x-rays also indicated moderate narrowing of the L2-3 and L5-S1 discs, with trace disc space narrowing at L4-5. *Id.*

Plaintiff followed up with Ms. Griffis on October 12, 2012. Tr. at 463. He indicated Dr. Alam had discontinued Elavil and prescribed Zoloft, but that he had resumed use of Elavil on his own because Zoloft was not helpful. *Id.* He reported that he was receiving counseling services and that it was going well. *Id.* Although Plaintiff had previously requested that his dosage of Lortab be increased, he reported that he no longer required an increased dose. *Id.*

Plaintiff complained of insomnia and increased back pain on October 31, 2012. Tr. at 469. He reported snoring and wheezing while sleeping. *Id.* He denied having received any benefit from Tramadol and endorsed regularly taking five Lortab per day. Tr. at 471. Dr. Alam noted that Plaintiff continued to smoke and had gained another 11 pounds. Tr.

at 469. He referred Plaintiff for bilateral hip x-rays and a sleep study. Tr. at 470. X-rays showed mild degenerative joint disease of Plaintiff's bilateral hips and moderate degenerative disc disease of his lumbar spine at L2-3, L4-5 and L5-S1. Tr. at 483. Ms. Griffis advised Plaintiff to stop smoking and to address his non-insulin dependent diabetes by controlling his diet and reducing his intake of sweets. Tr. at 474.

Plaintiff's pulmonary function tests were normal on November 27, 2012. Tr. at 480–82.

On December 4, 2012, Plaintiff's blood pressure was elevated and he reported increased PTSD symptoms. Tr. at 466. Mr. Snead increased Plaintiff's dosage of Coreg and added Prazosin for hypertension, which he noted may also provide some relief from PTSD symptoms. *Id.* He indicated Plaintiff reported stomach irritation from Nabumetone and prescribed Vimovo instead. *Id.* Mr. Snead indicated that Plaintiff's low vitamin D level may be contributing to his pain. *Id.* He prescribed Lipitor because Plaintiff's insurance declined to cover Crestor. *Id.* He added Spiriva, but indicated Plaintiff's breathing problems would improve if he were to stop smoking. Tr. at 467.

Plaintiff presented to Ms. Griffis for medication refills and adjustments on December 11, 2012. Tr. at 464. He indicated Al Watson, MSW, LISW-CP ("Mr. Watson"), wanted for him to discontinue Lamictal and start Amitriptyline. *Id.* He reported Mr. Watson was treating him for bipolar disorder, but that he did not feel like he had bipolar disorder. *Id.* He stated he felt angry all the time; had terrible nightmares; and did not want to be around his family members. *Id.* Ms. Griffis advised Plaintiff that the

addition of Amitriptyline would help his hypertension and decrease his nightmares. *Id.*
She arranged for Plaintiff's Lamictal dosage to be tapered down. *Id.*

Plaintiff presented to Spurgeon N. Cole, Ph.D. ("Dr. Cole"), on January 15, 2013,
for a consultative psychological examination. Tr. at 513–15. Dr. Cole observed that
Plaintiff was a "relatively pleasant, friendly, cooperative individual"; "displayed a good
attitude and demeanor"; had "good social and communication skills"; made eye contact
and related in a satisfactory manner; volunteered information and answered questions
without being defensive or evasive; had a mildly constricted affect and a sad and anxious
mood; demonstrated clear speech with "no evidence of an expressive or receptive
language disorder"; and had satisfactory judgment and reasoning abilities. Tr. at 513. He
noted that Plaintiff was "in moderate emotional distress" and did not "attempt to promote
or exaggerate symptoms." *Id.* He indicated Plaintiff showed no evidence of memory
deficits or loss of cognitive functioning. *Id.* Plaintiff reported being able to keep up with
his medications without reminders; visiting family and going to Wal-Mart, the grocery
store, and restaurants with his wife; using a checkbook and handling a savings account;
and watching television. Tr. at 514–15. He indicated he spent most of his time alone and
denied cooking, cleaning, or doing laundry. *Id.* Dr. Cole stated Plaintiff's activities of
daily living ("ADLs") were satisfactory, but indicated his social functioning was
moderately limited. Tr. at 515. He noted Plaintiff would have moderate difficulties
interacting with others and would need employment where he did not have to work
directly with the public on a full time basis. *Id.* He stated Plaintiff had good cognitive
ability and would have no difficulty handling funds in his own best interest. *Id.* His

diagnostic impressions were depression due to medical condition and generalized anxiety disorder. *Id.*

State agency medical consultant Ted Roper, M.D. ("Dr. Roper"), completed a physical residual functional capacity ("RFC") assessment on January 30, 2013. Tr. at 74–76 and 90–92. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; occasionally climb ladders/ropes/scaffolds; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. *Id.* Carl Anderson, M.D. ("Dr. Anderson"), assessed the same physical RFC on May 2, 2013. Tr. at 107–09 and 124–26.

On February 3, 2013, state agency consultant Craig Horn, Ph. D. ("Dr. Horn"), reviewed Plaintiff's medical records and prepared a psychiatric review technique form ("PRTF"). Tr. at 72–73 and 88–90. He considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and rated Plaintiff as having mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Horn indicated in a mental RFC assessment that Plaintiff was moderately limited with respect to his abilities to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 76–78 and 92–94. State agency consultant Anna P. Williams, Ph. D. ("Dr. Williams"), considered the same Listings,

found the same level of restriction, and assessed the same mental RFC on May 2, 2013. Tr. at 105–06, 109–11, 122–23, and 126–28.

On March 7, 2013, Plaintiff indicated his pain remained the same and was dependent on his activity level. Tr. at 465. Ms. Griffis titrated Plaintiff's dosage of Lamictal to address his complaints of anger. *Id.*

On May 3, 2013, Plaintiff reported that he had been taking additional Lortab pills because of left shoulder pain. Tr. at 557. He complained of abdominal pain and swelling in his left testicle. *Id.* The provider indicated Plaintiff's mood seemed to be stable. *Id.*

On May 16, 2013, Plaintiff reported left shoulder pain and chest discomfort with dyspnea on exertion. Tr. at 553. He indicated he was steadily gaining weight, but admitted to eating a significant amount of ice cream. *Id.* Dr. Alam referred Plaintiff for x-rays of his chest and left shoulder. Tr. at 554–55. The chest x-ray showed COPD changes, kyphoscoliosis, and degenerative disc disease. Tr. at 556. The x-ray of Plaintiff's left shoulder indicated no degenerative joint disease, fracture, or dislocation. *Id.* Dr. Alam referred Plaintiff to a dietician and increased his dosages of Crestor and Coreg. Tr. at 554–55.

Plaintiff complained of right shoulder pain, tenderness, and limited ROM on May 23, 2013. Tr. at 551. Kelly McCormick, FNP ("Ms. McCormick"), observed Plaintiff to have significant tenderness of the anterior shoulder supraspinatus tendon subdeltoid bursa. *Id.* She diagnosed left shoulder bursitis with osteoarthritis and tendinitis and administered a left shoulder anterior subdeltoid bursa injection. *Id.*

13

On July 3, 2013, an echo showed Plaintiff to have concentric left ventricular hypertrophy, mild mitral and tricuspid regurgitation, and normal left ventricular systolic function. Tr. at 549. On July 19, 2013, an adenosine cardiolite stress test was negative for ischemia. Tr. at 547.

Plaintiff reported left groin pain on August 29, 2013. Tr. at 546. Dr. Alam observed Plaintiff to have left inguinal tendinitis at the pubic tubercle. *Id.* He prescribed Nabumetone and instructed Plaintiff to use ice packs, to avoid heavy lifting, and to engage in small stretching exercises. *Id.*

Plaintiff presented to Jason Gosnell, D.O. ("Dr. Gosnell"), on September 16, 2013. Tr. at 542. He complained that his pain medications were no longer controlling his pain as well as they had in the past. *Id.* Dr. Gosnell noted Plaintiff's bipolar disorder and PTSD were stable on his current medication regimen. *Id.* He diagnosed Plaintiff with low testosterone, but Plaintiff declined treatment for financial reasons. Tr. at 543. Dr. Gosnell discussed Plaintiff's medication regimen with Dr. Alam, who recommended Plaintiff be started on MS Contin. Tr. at 544.

Plaintiff complained of bilateral wrist pain on October 31, 2013. Tr. at 541. Leslie Simmons, M.A. ("Ms. Simmons"), noted that Plaintiff was wearing a splint on his left hand and admitted to having sustained injuries to his hands in the past. *Id.* Plaintiff stated his chronic pain was well-controlled on his medication regimen and that he was no longer waking during the night because of pain. *Id.* He rated his pain as a two to three on a 10-point scale. *Id.* He indicated he would schedule an office visit to discuss his hand pain if it persisted. *Id.*

On December 2, 2013, Plaintiff reported his mood was stable and his pain had "leveled out." Tr. at 540. However, he stated he was experiencing more joint and muscle pain since starting Crestor. *Id.* Ms. Simmons indicated Plaintiff should discuss the side effects from Crestor with Dr. Alam during his next office visit. *Id.*

Plaintiff reported his pain was controlled and his mood was stable on December 31, 2013. Tr. at 539. Ms. Simmons changed Plaintiff's pain medication from Lortab to Norco and administered a B12 injection. *Id.*

On January 14, 2014, Plaintiff stated he had discontinued use of Crestor because he was experiencing myalgias. Tr. at 533. Ms. Griffis advised Plaintiff to decrease his intake of fatty foods and carbohydrates and to try to resume use of Crestor. Tr. at 535. She also recommended Plaintiff exercise regularly, stop smoking, hydrate, and continue to follow up with his counselor. *Id.*

On January 31, 2014, Plaintiff reported his pain was much better controlled. Tr. at 532. He stated his mood was stable and that his sleep had improved. *Id.* Ms. Simmons administered a B12 injection and refilled Plaintiff's medications. *Id.*

Plaintiff stated his pain was well-controlled on his current regimen on February 28, 2014. Tr. at 531. However, he reported increased stress and aggravation and an unstable mood and requested that his dosage of Lamictal be increased. *Id.* Ms. Simmons indicated Plaintiff's dosage of Lamictal could not be increased because he was currently taking the maximum dosage. *Id.* She instead increased Plaintiff's dosage of Amitriptyline. *Id.*

On March 31, 2014, Plaintiff reported that his current medications controlled his pain and that the increased dosage of Amitriptyline had improved his mood. Tr. at 530. Ms. Simmons noted that Plaintiff complained of knee pain, but indicated he should discuss it further with Dr. Alam when he returned for a B12 injection the next month. *Id.*

Mr. Snead noted that Plaintiff's vitamin D level remained low and prescribed 2000 units of vitamin D on April 22, 2014. Tr. at 526. Plaintiff reported pain and swelling in his left knee and ankle. *Id.* Mr. Snead observed Plaintiff to have some effusion, slight crepitus and pain with ROM, and tenderness over his left knee. Tr. at 527. He also noted Plaintiff had some tenderness on the medial aspect of the collateral ligaments of his left ankle. *Id.* He prescribed Prednisone for the left knee and ankle pain. *Id.* An x-ray of Plaintiff's left knee showed mild degenerative joint disease, and an x-ray of his left ankle showed either a small medial malleolus ossicle or an old fracture. Tr. at 529.

On April 30, 2014, Plaintiff indicated his medications were working well and that his anger issues had improved with the increased dose of Amitriptyline. Tr. at 525. He stated Prednisone had helped his leg pain, but indicated he continued to have pain in his ankle. *Id.* Plaintiff rated his pain as a four on a 10-point scale. *Id.*

Plaintiff was admitted to Oconee Medical Center on May 6, 2013, for chest pain. Tr. at 568. He also endorsed a three-week history of testicular pain. *Id.* An electrocardiogram ("EKG") showed no acute changes and a cardiac enzyme test was negative. Tr. at 570. Plaintiff declined a nuclear stress test and indicated his chest pain likely resulted from anxiety. *Id.* Mark S. Wagner, M.D. ("Dr. Wagner"), observed Plaintiff to have left testicular swelling. *Id.* He noted an ultrasound showed no focal

16

mass, but did not rule out a possible inflammatory or neoplastic process. *Id.* He assumed Plaintiff had an infection and prescribed Naproxen and Ciprofloxacin. *Id.*

### C. The Administrative Proceedings

#### 1. The Administrative Hearing

##### a. Plaintiff's Testimony

At the hearing on August 7, 2014, Plaintiff testified he had gained 35 to 40 pounds since he stopped working. Tr. at 42. He stated he last worked at Lowe's for 10 weeks in 2010. Tr. at 44. He indicated he subsequently accepted a production job through a staffing agency, but asked to leave after four hours because of back pain. Tr. at 46–47.

Plaintiff testified that the arthritis in his spine and hips prevented him from being able to work. Tr. at 47–48. He indicated his arthritis affected his ability to move and to sleep. Tr. at 48. However, he later described the pain in his back and hips as "a minor pain" that occurred "constantly" and indicated his medication "keeps it bearable most of the [time]." Tr. at 49. He stated he could reduce his back and hip pain by taking a steaming shower. *Id.* He indicated he had been treated with muscle relaxers and some pain medication and had been given a back brace. *Id.* He denied having participated in physical therapy or having seen a chiropractor. *Id.*

Plaintiff testified he experienced symptoms of depression and anxiety. Tr. at 48. He indicated he could not do many of the things that he enjoyed doing in the past because of his pain. *Id.* He reported that his memory was impaired and that he often became sidetracked. Tr. at 55. He indicated he had difficulty sleeping because of nightmares and pain. Tr. at 57. He testified he felt nervous and anxious around people he did not know.

17

Tr. at 58. He indicated he sometimes had difficulty dealing with his family members and stayed in his room on two to four days per month. Tr. at 58. He reported having crying spells once or twice a month. Tr. at 59. He stated he also had COPD and experienced intermittent swelling in his knees, ankles, shoulder, and wrist. Tr. at 48. He indicated he had carpal tunnel syndrome in his bilateral wrists and experienced some trembling in his hands. Tr. at 49 and 54. He reported continued pain in his right shoulder and stated he had some pain in his left shoulder, but indicated he had not sought treatment for shoulder pain. *Id.* He stated his medications were generally effective, but caused drowsiness and dizziness. Tr. at 53. He indicated he experienced dizziness once or twice a week. Tr. at 58.

Plaintiff testified he could stand for five minutes and sit for 15 to 20 minutes at a time. Tr. at 53. He estimated he could walk less than half a block. *Id.* He indicated he could lift 10 to 20 pounds occasionally, but less than five pounds repeatedly. *Id.* He stated he used a cane when he experienced swelling in his ankles and knees. Tr. at 54.

Plaintiff testified he awoke at 6:30 a.m. on school days and prepared breakfast for his nine-year-old son. Tr. at 50. He indicated he sat on a stool to brown ground beef for tacos. Tr. at 50 and 56. He stated his son generally took care of himself and that he was "there with him so he is not at home . . . alone." Tr. at 56. He confirmed that he was able to bathe on his own, but indicated he had a history of falls and did not bathe when no one else was home. Tr. at 51 and 57. He stated he was able to shave and could dress himself, but had some difficulty moving his shoulder to put on a button-down shirt. *Id.* He denied doing laundry, cleaning, and performing yard work. *Id.* He indicated he visited a Dollar

18

General store that was 400 yards from his home to pick up a few items at a time. *Id.* He stated he socialized with his extended family during meals, but was unable to participate in a family camping trip. *Id.* He denied visiting with friends, attending church, or seeing movies in a theater. Tr. at 52. He indicated he did not often go out to dinner. *Id.* He denied using a computer. *Id.* He stated his two hobbies had been bowling and playing horseshoes, but he was no longer able to do either. Tr. at 57.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Carl Weldon reviewed the record and testified at the hearing. Tr. at 59–64. The VE categorized Plaintiff's PRW as a maintenance technician, *Dictionary of Occupational Titles* ("*DOT*") number 606.685-014, as heavy with a specific vocational preparation ("SVP") of five and a production operator, *DOT* number 829.261-018, as medium with an SVP of four. Tr. at 60. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry up to 20 pounds occasionally and up to 10 pounds frequently; stand or walk for approximately six hours during an eight-hour workday; sit for approximately six hours during an eight-hour workday; occasionally climb ladders, ropes, or scaffolds; frequently climb ramps or stairs, balance, stoop, crouch, kneel, or crawl; must avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases; must avoid concentrated use of moving machinery; must avoid concentrated exposure to unprotected heights; and may have only occasional interaction with the public and coworkers. Tr. at 60–61. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 61. The ALJ asked whether there were any other jobs in the regional or national

economy that the hypothetical person could perform. *Id.* The VE identified light, unskilled jobs as a packager, *DOT* number 753.687-038, with 1,900 positions in the regional economy and 622,000 positions in the national economy; an inspector, *DOT* number 741.687-010, with 2,800 positions in the regional economy and 473,000 positions in the national economy; and a garment sorter, *DOT* number 222.687-014, with 1,100 positions in the regional economy and 239,000 positions in the national economy. *Id.*

For a second question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited to light work as described in the first hypothetical; could never climb ladders, ropes, scaffolds, ramps, or stairs; could frequently balance; could occasionally stoop, crouch, and kneel; could never crawl; must avoid concentrated exposure to environmental irritants such as fumes, odors, dust, and gases; must avoid concentrated exposure to the use of moving machinery and unprotected heights; and was limited to one or two-step tasks with no interaction with the public and only occasional interaction with coworkers. Tr. at 62. He asked the VE if he could identify jobs that would accommodate the specified limitations. *Id.* The VE testified that the jobs identified in response to the first hypothetical question could also be performed with the additional limitations. *Id.*

For a third question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile with the same limitations set forth in the second question, but to further assume the individual could not sustain sufficient concentration, persistence, or pace to do even simple, routine, repetitive tasks on a regular and continuing basis over the course

of an eight-hour day, five-day week, or 40-hour workweek. Tr. at 62–63. He asked if there would be jobs available for someone with those limitations. Tr. at 63. The VE testified that there would be no work that the individual could perform. *Id.*

Plaintiff's attorney asked the VE to assume the individual would miss three or more days of work per month due to a combination of physical and mental impairments. *Id.* He asked if the individual could perform any gainful employment. *Id.* The VE indicated the individual could perform no work. *Id.*

Plaintiff's attorney asked the VE if there would be any work available if the individual were limited to sitting and standing for less than two hours a day. Tr. at 64. The VE indicated there would be no work available to the individual. *Id.*

Plaintiff's attorney asked the VE to assume the individual would need to take frequent, unscheduled breaks throughout the day. *Id.* The VE stated there would be no work available to the individual. *Id.*

2.    The ALJ's Findings

In his decision dated October 31, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.
2.    The claimant has not engaged in substantial gainful activity since April 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: spine disorders; affective mood disorders; and chronic obstructive pulmonary disease (hereinafter COPD) (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets of medically equals the severity of one of the listed impairments

21

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Function by function, the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can never engage in the climbing [of] ladders, ropes, scaffolds, ramps or stairs. The claimant can frequently balance and occasionally stoop, crouch, or kneel. The claimant can never crawl and should avoid concentrated exposure to environmental irritants such as fumes, odors, dusts and gases. The claimant should avoid concentrated use of moving machinery and exposure to unprotected heights. The claimant is limited to one or two-step tasks, with no interaction with the public and only occasional interaction with coworkers.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on August 7, 1965 and was 44 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has not acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–29.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ did not include Plaintiff's moderate limitations in concentration, persistence, or pace in the hypothetical question he posed to the VE;

2)     the ALJ did not consider the combined effect of Plaintiff's impairments in assessing his RFC; and

3)    the ALJ did not adequately weigh Plaintiff's treating medical providers' opinions.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 and 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b) and 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525 and 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526 and 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and 416.920(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.     Analysis

          1.     Moderate Limitation in Concentration, Persistence, or Pace

Plaintiff argues the ALJ erred in posing a hypothetical question to the VE that did not accommodate his moderate limitation in concentration, persistence, or pace. [ECF No. 10 at 24–25]. He maintains that the restrictions to "one or two-step tasks, with no interaction with the public and only occasional interaction with coworkers" were insufficient. *Id.* at 24. He contends the hypothetical question did not include a restriction that addressed his impaired "ability to concentrate, pay attention and [be] persistent with tasks." *Id.* at 24–25.

The Commissioner argues the ALJ recognized that Plaintiff's problems with social interactions limited his ability to concentrate and persist at tasks and that he accommodated this limitation by restricting Plaintiff to work that required no interaction with the public and only occasional interaction with coworkers. [ECF No. 11 at 7–8]. She maintains the ALJ specifically stated that "restrictions caused by [Plaintiff's] anxiety or

panic attacks are not debilitating in nature, but can be accommodated in a work environment." *Id.* at 7.

For a VE's opinion to support a finding that the claimant can perform specific jobs "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

In *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), the ALJ failed to include any mental limitations in the hypothetical question he posed to the VE, despite the fact that he credited the plaintiff's diagnosis of an adjustment disorder and found that she had moderate difficulties in maintaining concentration, persistence, or pace. The ALJ then relied on the VE's unsolicited identification of unskilled work to match his RFC finding. *Mascio*, 780 F.3d at 638. The court found that the ALJ erred in assessing the plaintiff's RFC. *Id.* The court stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id*. The court further explained that "the ALJ may find that the concentration, persistence, or pace limitation

does not affect Mascio's ability to work . . . [b]ut because the ALJ here gave no explanation, a remand is in order." *Id.*

This court has interpreted the Fourth Circuit's holding in *Mascio* to emphasize that an ALJ must explain how he considered the claimant's moderate limitation in concentration, persistence, or pace in assessing his RFC. *See Sipple v. Colvin*, No. 8:15-1961-MBS-JDA, 2016 WL 4414841 (D.S.C. Jul. 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After Mascio, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC."); *see also Davis v. Colvin*, No. 0:14-4314-TMC-PJG, 2015 WL 7871172, at *4 (D.S.C. Dec. 4, 2015) ("As discussed above and contrary to the *Mascio* case, the ALJ accounted for Davis's limitations and credibility in determining her RFC prior to proceeding to steps four and five. Further, the ALJ found that any limitation in Davis's concentration, persistence, or pace did not affect her ability to perform simple, routine, repetitive tasks."); *Falls v. Colvin*, No. 8:14-195-RBH, 2015 WL 5797751, at *7 (D.S.C. Sept. 29, 2015) ("As opposed to the hypothetical in *Mascio*, which said nothing about the claimant's mental limitations, the ALJ's hypothetical in this case accounted for each of Plaintiff's mental limitations. The ALJ also accounted for Plaintiff's limitations in the area of concentration when determining Plaintiff's RFC. The ALJ noted Plaintiff's mental limitations but found that the Plaintiff could 'concentrate, persist and work at pace to do simple, routine, repetitive work at 1–2 step instructions for extended periods say 2-hour periods in an 8-hour day.'"); *Gilbert v. Colvin*, No. 2:14-981-MGL-MGB, 2015 WL 5009225, at *14

(D.S.C. Aug. 19, 2015) ("In *Mascio*, the ALJ concluded the plaintiff had a moderate limitation in concentration, persistence, or pace but did not include any corresponding limitation in the plaintiff's RFC, nor did the ALJ explain the reasons for not including such a limitation. In the case *sub judice*, however, the ALJ limited Plaintiff to 'simple work,' specifically relying on Dr. Boland's assessment that despite Plaintiff's 'difficulty sustaining her concentration and pace on complex tasks,' Plaintiff 'should be able to . . . perform simple tasks without special supervision.'").

In the instant case, the ALJ posed a hypothetical question to the VE that included mental limitations to one or two step tasks with no interaction with the public and only occasional interaction with coworkers. Tr. at 62. Thus, this case differs from *Mascio* in that the ALJ included specific limitations that pertained to Plaintiff's mental limitations in the hypothetical question he posed to the VE.

Like the ALJ in *Mascio*, this ALJ found that Plaintiff had moderate difficulties in concentration, persistence, or pace. Tr. at 22. However, unlike the ALJ in *Mascio*, this ALJ provided an adequate explanation for how he considered Plaintiff's moderate limitation in concentration, persistence, or pace. He explained that Dr. Cole observed that Plaintiff was able to concentrate well. Tr. at 22. He stated Plaintiff's reports that he watched television during the day illustrated his ability to sustain concentration for extended periods. *Id.* He noted that the record suggested Plaintiff had "little to no difficulty in this category," but that Mr. Watson indicated Plaintiff's attention and concentration were moderately distractible. *Id.* He found that Plaintiff's abilities to

concentrate, pay attention, and persist with tasks were affected, but were not debilitating in nature and could be accommodated in a work environment. *Id.*

The ALJ explained his reasons for concluding that Plaintiff was no more limited than determined in the assessed RFC. He stated that the assessed RFC reflected the degree of limitation he had found Plaintiff to have in the paragraph B mental function analysis. Tr. at 23. He limited Plaintiff to one or two step tasks with no interaction with the public and only occasional interaction with coworkers. *Id.* In discussing the assessed RFC, he noted that Plaintiff's affective mood disorder had been treated with medications and outpatient therapy. Tr. at 25. He acknowledged that Plaintiff's medications had been adjusted at times, but found that his depression had improved with treatment and was relatively stable. *Id.* The ALJ relied heavily on Dr. Cole's observations, noting that he had "remarked that the claimant appeared sad and anxious, as well as had a mildly conflicted affect," but "did not opine that the claimant's affective mood disorder was disabling in nature, and opined that he was capable of concentrating well enough to complete a task in a timely manner and has the ability to learn simple, as well as complex tasks." *See id.* He recognized that "Dr. Cole opined the claimant had moderate difficulties interacting with others and would require a job, which does not require him to work directly with the public on a full-time basis." *Id.* Thus, the ALJ stated "[t]o that end, based on the evidence in the treatment records and Dr. Cole's evaluation, the evidence concerning the claimant's affective mood disorder does not demonstrate he suffers from severe emotional limitation that would interfere with his ability to perform the range of work identified above." *Id.*

The ALJ explained that he relied heavily on Dr. Cole's assessment and provided clarification for his determination that Plaintiff's moderate limitations in concentration, persistence, or pace limited him no more than to the extent indicated in the RFC assessment. *See* Tr. at 23 and 23. In light of the ALJ's explanation, the undersigned recommends the court find he cited sufficient evidence to support his conclusion that Plaintiff's moderate limitation in concentration, persistence, or pace could be accommodated by limiting him to one or two step tasks that involved no interaction with the public and only occasional interaction with coworkers.

### 2.    Combination of Impairments

Plaintiff argues the ALJ did not consider the combined effect of his impairments in assessing his RFC. [ECF No. 10 at 25–27]. He contends the ALJ did not adequately consider evidence that showed his physical and mental impairments to be intertwined. *Id.* at 26–27.

The Commissioner argues the ALJ recognized that Plaintiff's back pain affected his depression and his depression affected his pain. [ECF No. 11 at 10]. She maintains the ALJ provided an extensive explanation to support his conclusion that Plaintiff's combination of impairments was not disabling. *Id.* at 9. She contends Plaintiff has failed to identify limitations that were supported by the combination of his impairments, but omitted from the assessed RFC. *Id.* at 10.

In determining whether a claimant's physical or mental impairments are severe enough to support a finding of disability, an ALJ must consider the combined effect of all the claimant's impairments, "without regard to whether any such impairment, if

considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523 and 416.923. The combined effect of the individual's impairments should be considered at each stage of the disability determination process. *See id.* When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and his disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* The Fourth Circuit has declined to elaborate on what serves as adequate explanation of the combined effect of a claimant's impairments. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). However, this court has specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Furthermore, absent evidence to the contrary, the courts should accept the ALJ's assertion that he has considered the combined effect of the claimant's

impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

Plaintiff does not point to any specific limitations imposed by his combination of physical and mental impairments that the ALJ failed to consider, but asserts that their combined effect was disabling. Therefore, the undersigned has considered whether the ALJ cited substantial evidence to support his conclusion that Plaintiff's combination of impairments was not disabling.

The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing. Tr. at 21. He specifically noted that Plaintiff had informed Dr. Cole "that since his physical health has deteriorated, he is irritable, less outgoing and has difficulty relating to others (Exhibit 8F, page 1)." Tr. at 22. However, he considered Plaintiff's social interaction abilities as a whole to conclude that he had moderate difficulties. *See id.* Thus, the ALJ considered the combined effect of Plaintiff's impairments at step three.

Although the ALJ did not explicitly state that he considered Plaintiff's mental and physical impairments in combination in assessing his RFC, a review of the decision as a whole shows that he considered the connection between Plaintiff's physical and mental impairments and that the absence of a specific statement to that effect was harmless error. This court has traditionally excused errors as harmless in cases where the ALJ "would

have reached the same result notwithstanding" the error. *See Mickles v. Shalala*, 29 F. 3d 918, 921 (4th Cir. 1994).

The ALJ recognized that Plaintiff asserted that "[a]s his back pain has become more severe, he has begun to feel more depressed, which further aggravates his pain symptoms (Exhibit 3F, page 34)." Tr. at 24. However, he also noted that Plaintiff "suffers from an affective mood disorder and while this condition is severe, the symptoms this condition causes appear to wax and wane in severity depending on the timing of the examination/opinion." Tr. at 26. If we are to assume that Plaintiff's pain increased his mental health symptoms and that his increased mental health symptoms worsened his pain, it logically follows that a reduction in his pain would result in less severe mental health symptoms. Thus, it was reasonable for the ALJ to cite evidence that suggested Plaintiff's pain had responded well to medication management and that his depression had improved with treatment and was relatively stable. Tr. at 24–25. The ALJ also pointed out that Plaintiff did not complain of debilitating pain during routine medical visits and characterized his pain as constant and minor in his testimony during the hearing. Tr. at 25. Thus, the ALJ concluded that Plaintiff's pain and depression were not disabling because both had been reduced by medication and treatment. He referenced Plaintiff's specific ADLs, his social functioning, results of consultative examinations, and Plaintiff's reports to his physicians. *See* Tr. at 21–22 and 24–27.

Because the ALJ cited adequate evidence to support his finding that Plaintiff's combination of pain and depression were not disabling, the undersigned recommends the

court find that he did not err in assessing the combined effect of Plaintiff's physical and mental impairments.

### 3.    Medical Opinions

Plaintiff argues the ALJ did not adequately weigh the opinion evidence of record. [ECF No. 10 at 27–35]. The Commissioner maintains the ALJ relied on substantial evidence to support the weight he accorded to the opinion evidence. [ECF No. 11 at 11–17].

ALJs are required to consider all medical opinions in the record. 20 C.F.R. §§ 404.1527(b) and 416.927(b). The ALJ must explicitly indicate the weight given to all relevant evidence in order to allow for meaningful review. *Gordon v. Schweiker*, 725 F.3d 231, 235 (4th Cir. 1984). If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Nevertheless, it is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the

ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The undersigned examines the ALJ's evaluation of the opinion statements offered by Dr. Alam and Mr. Watson in view of the foregoing authority.

a.    Dr. Alam's Opinions

On September 24, 2012, Dr. Alam completed a questionnaire regarding Plaintiff's mental condition. Tr. at 447. He stated Plaintiff's diagnosis was "bipolar" and that he was prescribed Lamictal and Elavil. *Id.* He indicated that psychiatric care had been recommended; that Plaintiff had a history of hospitalization in 1995; and that "poor finances" prevented him from visiting a private psychiatrist. *Id.* Dr. Alam described Plaintiff as being oriented in all spheres; having a slowed and distractible thought process; showing appropriate thought content; demonstrating a flat and depressed mood/affect; having poor attention/concentration; and showing adequate memory. *Id.* He stated Plaintiff had a serious mental condition, but was capable of managing his funds. *Id.*

On July 21, 2014, Dr. Alam completed a form entitled "PHYSICAL QUESTIONNAIRE." Tr. at 616–17. He indicated Plaintiff's diagnoses included moderate, recurrent major depressive disorder, PTSD, bipolar disorder, osteoarthritis of the bilateral hips and knees, and severe spinal degenerative disc disease. Tr. at 616. He assessed Plaintiff's prognosis as "poor." *Id.* He indicated Plaintiff was not a malingerer. *Id.* He stated Plaintiff's experience of pain or other symptoms was constantly severe

36

enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* He estimated Plaintiff could walk half a block without rest or severe pain. *Id.* He indicated Plaintiff could sit for 15 minutes and stand for five minutes at a time. *Id.* He stated Plaintiff could sit for less than two hours and stand and walk for less than two hours during an eight-hour workday. *Id.* He estimated Plaintiff could occasionally lift and carry less than 10 pounds, could rarely lift and carry 10–20 pounds, and could never lift and carry 50 pounds. *Id.* He stated Plaintiff could occasionally climb stairs, but could never twist, stoop (bend), crouch/squat, or climb ladders. Tr. at 617. He estimated Plaintiff would likely be absent from work for more than four days per month because of his impairments or treatment. *Id.* He indicated Plaintiff's physical condition was affected by psychological conditions that included depression, anxiety, PTSD, and bipolar disorder. *Id.* He stated Plaintiff had poor concentration, was forgetful, had low self-esteem, had poor interpersonal relationships, and was unable to engage in any meaningful employment. *Id.*

Plaintiff argues the ALJ cited inadequate reasons for assigning little weight to Dr. Alam's opinions. [ECF No. 10 at 29 and ECF No. 12 at 8–12]. He maintains the ALJ erred in relying on a notion of unquantified stability to refute Dr. Alam's September 2012 opinion. [ECF No. 10 at 30 and ECF No. 12 at 9]. He contends the ALJ made a general, conclusory statement about the inconsistency of Dr. Alam's opinion with the record as a whole and failed to cite specific reasons to support the weight he assigned to the opinion. [ECF No. 10 at 30 and ECF No. 12 at 9]. He argues the ALJ unreasonably used Dr. Watson's statement to refute Dr. Alam's opinion. [ECF No. 10 at 31 and ECF No. 12 at

9–10]. He maintains the ALJ did not explain why his daily functioning undermined Dr. Alam's opinion. [ECF No. 10 at 31–32 and ECF No. 12 at 10–12].

The Commissioner argues the ALJ provided multiple reasons for giving little weight to Dr. Alam's opinions. [ECF No. 11 at 13]. She maintains the ALJ explained that Dr. Alam's September 2012 opinion was inconsistent with his treatment note from the next month's visit, general information in the record concerning Plaintiff's symptoms and course of treatment, and Mr. Watson's May 2013 opinion. *Id.* She contends the ALJ considered the context of the opinion because he found that the record as a whole did not show disabling mental impairments. *Id.* at 14. The Commissioner maintains the ALJ explained that Dr. Alam's July 2014 opinion was inconsistent with evidence in the record that Plaintiff was responding well to his medication and evidence of his daily functioning. *Id.* at 13. She argues the decision as a whole includes discussion of the inconsistencies between the Dr. Alam's opinion and the evidence of record. *Id.* at 14–15. She states the ALJ explained his reasons for concluding that Plaintiff's activities were only mildly limited and duly cited those mildly limited ADLs as evidence that refuted the degree of limitation Dr. Alam advanced. *Id.* at 15.

The SSA's regulations require that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); SSR 96-2p. A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory

diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004)[3]; *see also* 20 C.F.R. § 404.1427(c)(4). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

The ALJ must give good reasons for the weight he accords to the treating source's opinion. SSR 96-2p. The notice of decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ acknowledged that Dr. Alam indicated in a brief questionnaire in September 2012 that Plaintiff was not responding to medication and that his mental condition was causing a serious work-related limitation. Tr. at 26. However, the ALJ further noted that one month later, Dr. Alam indicated Plaintiff's counseling was going well. *Id.* He stated Dr. Alam's opinion was inconsistent with the general information in the record concerning Plaintiff's symptoms and course of treatment and conflicted with

---

[3] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

Mr. Watson's opinion. *Id.* He then cited Mr. Watson's May 2013 opinion and interpreted it to indicate that "although the claimant's affective mood disorder causes some restrictions in social functioning and concentration, persistence, or pace, his ability to engage in basic activities of daily living, relate to others, complete simple, routine tasks and complex tasks is adequate." *Id.* Thus, he accorded little weight to Dr. Alam's September 2012 opinion. *Id.*

The ALJ further acknowledged Dr. Alam's July 2014 opinion "in which he opined the claimant's impairments interfere with his ability to engage in any meaningful employment." *Id.* He accorded this opinion little weight because "it is clearly not supported by the evidence in the record that the claimant is responding well to his medication and even his daily functioning, as he is able to care for himself and his son, as well as engage in a variety of household chores." *Id.*

The ALJ found that Dr. Alam's opinions were entitled to significantly less than controlling weight because they were inconsistent with his own treatment notes and the other substantial evidence of record. *See Mastro*, 270 F.3d at 178. In discounting Dr. Alam's September 2012 and July 2014 opinions, the ALJ did not rely exclusively on an isolated note of improvement, but instead looked to the record as a whole. He noted that symptoms of Plaintiff's affective mood disorder appeared to wax and wane in severity and that his providers offered varying opinions regarding the severity of the impairment "depending on the timing of the examination/opinion." Tr. at 26. He reasonably cited a notation of improvement following the initiation of therapy one month after the September 2012 opinion was offered. *See* Tr. at 26, citing Tr. at 463. Earlier in his

decision, the ALJ referenced Plaintiff's presentation and the impressions of Dr. Holt in October 2012 and Dr. Cole in January 2013, as well as Plaintiff's reports to his treating providers and their observations and objective findings, which were inconsistent with the degree of limitation assessed by Dr. Alam. *See* Tr. at 21–22 and 24–26. The ALJ also cited the inconsistency between Dr. Alam's September 2012 opinion and Mr. Watson's May 2013 opinion. Tr. at 26. In May 2013, Mr. Watson indicated Plaintiff was able to complete basic ADLs, relate to others, and perform simple, routine, and complex tasks, which was in contrast to Dr. Alam's September 2012 opinion that Plaintiff had serious work-related mental limitations. *Compare* Tr. at 447, *with* Tr. 518.

The ALJ noted that Dr. Alam's July 2014 opinion was inconsistent with evidence that Plaintiff was responding well to his medications. Tr. at 26. Earlier in the decision, the ALJ discussed Dr. Holt's findings, the diagnostic imaging, and the treatment records with respect to Plaintiff's spinal impairment. Tr. at 24. He acknowledged that Plaintiff's spinal impairment "causes some pain and tenderness," but noted that "the evidence in the record illustrates he has generally responded well to medication management and other treatment modalities such as stretching and physical therapy (Exhibits 3F, pages 1, 4, 6, 8, 9, 14, 24, and 31, 6F, page 2, 7F, pages 1 and 5, 11F, page 15 and 17 and 12F, page 4)." *Id.* He also cited to record evidence to support his finding that although Plaintiff's medications had been adjusted at times, his depression had improved with treatment and was relatively stable. Tr. at 25. The ALJ supported his decision to give little weight to Dr. Alam's July 2014 opinion by referencing Plaintiff's daily functioning and noted that Plaintiff was able to care for himself and his son and engage in a variety of household

chores. Tr. at 26. Previously, the ALJ offered a detailed explanation for finding that Plaintiff had only mild restriction of ADLs. Tr. at 21–22. Thus, the ALJ concluded that the evidence of Plaintiff's mild restriction of ADLs was inconsistent with the degree of limitation suggested by Dr. Alam.

A review of the decision demonstrates that the ALJ considered the relevant factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in weighing Dr. Alam's opinion statements. *See* Tr. at 24 (citing Dr. Alam's clinical findings and observations), 25 (noting Dr. Alam's recommendation for outpatient therapy and his observations during routine examinations, acknowledging that Plaintiff described his pain as "minor" during the hearing, and observing that the objective evidence did not show Plaintiff's physical impairments to be disabling), and 26 (identifying Dr. Alam as a treating physician and remarking that Plaintiff's physicians and therapists had provided varying opinions about the severity of his affective mood disorder, but that the evidence indicated his mental health treatment had been effective and his functioning was adequate).

In light of the foregoing, the undersigned recommends the court find that substantial evidence supports the ALJ's decision to accord little weight to Dr. Alam's opinions based on their inconsistency with his own treatment notes and the other evidence of record.

b.     Mr. Watson's Opinion

Mr. Watson completed an assessment form regarding Plaintiff's mental condition on May 2, 2013. Tr. at 517–18. He indicated that he had provided twice monthly outpatient counseling to Plaintiff from October 9, 2012, through April 9, 2013. Tr. at 517.

He stated Plaintiff had not been psychiatrically hospitalized in the last year. *Id.* He described Plaintiff's compliance as "good" and indicated Plaintiff was at his treatment baseline, but continued to have some symptoms. *Id.* He stated Plaintiff's condition was chronic and that full remission was unexpected. *Id.* He indicated Plaintiff's diagnoses to include PTSD and depression. *Id.* He stated Plaintiff's medications included Lamictal and Zoloft. *Id.* He described Plaintiff as having appropriate grooming/hygiene; being oriented to time, person, and place; having an appropriate mood and affect; demonstrating a depressed, irritable, and anxious mood; having a normal thought process; demonstrating no perceptual distortions; having average cognitive ability; being moderately distractible; and having mild memory deficits. Tr. at 518. He assessed Plaintiff as having adequate abilities to complete basic ADLs; to relate to others; and to complete simple, routine, and complex tasks. *Id.*

On June 2, 2014, Mr. Watson completed a mental impairment questionnaire. Tr. at 600–02. He indicated his treatment of Plaintiff included individual psychotherapy and cognitive behavioral therapy. Tr. at 600. He stated Plaintiff had experienced some decrease in depressive symptoms and some improvement in his self-esteem, but that his depression was chronic. *Id.* He denied that Plaintiff's medications caused side effects. *Id.* He checked blanks to indicate the following with respect to Plaintiff:

> Medically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following:

43

> A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

*Id.* He identified Plaintiff's signs and symptoms as decreased energy; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; apprehensive expectation; emotional withdrawal or isolation; emotional lability; memory impairment (short, intermediate, or long term); sleep disturbance; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. Tr. at 601. He assessed Plaintiff as having extreme restriction of ADLs; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace; and four or more repeated episodes of decompensation within a 12-month period that were each of at least two weeks' duration. Tr. at 602. He estimated Plaintiff would be absent from work more than four days per month because of his impairments or treatment. *Id.*

On July 30, 2014, Mr. Watson observed Plaintiff to have an anxious mood and affect. Tr. at 615. He indicated Plaintiff was experiencing symptoms of PTSD and that his sleep was poor. *Id.* He indicated he had seen Plaintiff twice monthly since May 10, 2013, and that Plaintiff's global assessment of functioning ("GAF")[4] score had remained

---

[4] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association:

at 60[5] throughout the treatment period. *Id.* He stated Plaintiff had unresolved thoughts and feelings about a history of sexual abuse as a child and that recurrent symptoms of PTSD interfered with his ability to function on a daily basis. *Id.* He stated Plaintiff's depression resulted from his medical condition and prevented him from performing his past work. *Id.* He noted Plaintiff had "progressed in anger management skills so as to not express anger in ways that would create social or legal problems." *Id.*

Plaintiff argues the ALJ failed to provide adequate reasons for rejecting Mr. Watson's opinions. [ECF No. 10 at 33 and ECF No. 12 at 12]. He maintains the ALJ erroneously relied on the GAF score Mr. Watson assessed to discredit his other opinions and contends that a GAF score of 60 was not inconsistent with a finding of disability. [ECF No. 10 at 34 and ECF No. 12 at 12–13].

The Commissioner argues the ALJ adequately explained his reasons for giving little weight to Mr. Watson's June 2014 opinion. [ECF No. 11 at 13]. She maintains the ALJ cited the inconsistency between the June 2014 opinion and Mr. Watson's assessment of a GAF score of 60 over a period of time, as well as record evidence that suggested Plaintiff had moderate symptoms. *Id.* at 13–14 and 16.

---

*Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[5] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*.

Acceptable medical sources that may provide medical opinions include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p; 20 C.F.R. § 404.1513(a) and 416.913(a). Because medical opinions may only be rendered by acceptable medical sources, ALJs are not required to explicitly weigh the opinions of other sources based on the criteria set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). SSR 06-03p. However, opinions from other medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* Because the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) represent basic principles for the consideration of all opinions evidence, they should guide ALJs in considering opinions provided by individuals who do not qualify as acceptable medical sources. *Id.*

"Since there is a requirement to consider all relevant evidence," the ALJ's decision "should reflect the consideration of opinions from medical sources who are not acceptable medical sources." *Id.* The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

The ALJ was not required to explicitly weight Mr. Watson's opinion because he was not an acceptable medical source. *See* 20 C.F.R. § 404.1513(d) and 416.913(d); *see also* 20 C.F.R. §§ 404.1513(a), 404.1527(a) and (b), 416.913(a), and 416.927(a) and (b).

Nevertheless, a review of the ALJ's decision demonstrates that he was guided by the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in evaluating Mr. Watson's opinions. *See* Tr. at 21 (discussing evidence that supported a finding that Plaintiff had mild restriction of ADLs), 22 (citing evidence that supported findings that Plaintiff had moderate difficulties in social functioning and concentration, persistence, or pace), 24 (summarizing Plaintiff's testimony), 25 (discussing Plaintiff's treatment history with Dr. Alam and Dr. Cole's observations), and 26–27 (noting inconsistencies between Mr. Watson's opinion statement and his treatment record).

The ALJ discussed Mr. Watson's June 2014 opinion, but gave it little weight because he found that it was contradicted by Mr. Watson's July 2014 statement that Plaintiff's GAF score had remained stable at 60. Tr. at 26–27. The ALJ noted that a GAF score of 60 was "indicative of moderate symptoms and clearly not consistent with his opinion the claimant suffers from marked to extreme functional limitations." Tr. at 27. He accorded some weight to the GAF score Mr. Watson assessed based on its consistency with the general evidence of record. *Id.*

The ALJ cited sufficient evidence to support his decision to give little weight to Mr. Watson's June 2014 opinion. As discussed earlier, the ALJ noted that Plaintiff's treating providers had assessed varying opinions about the severity of his impairments at different times (Tr. at 26), and a comparison of Mr. Watson's opinions demonstrates the ALJ's point. In May 2013, Mr. Watson noted that Plaintiff had chronic mental impairments and that he had some abnormalities in his mental status, but he did not find that Plaintiff's mental functioning was so undermined as to prevent him from completing

basic ADLs, relating to others, and performing simple and routine or complex tasks. *See* Tr. at 518. However, 13 months later, he found that Plaintiff's mental impairments were so severe that his ADLs were extremely restricted; he had marked difficulties in maintaining social functioning and with respect to concentration, persistence, or pace; he had experienced four or more repeated episodes of decompensation within a 12-month period that were each of at least two weeks' duration; and he would be absent from work more than four days per month because of his impairments or treatment. Tr. at 601–02. Approximately eight weeks thereafter, Mr. Watson indicated Plaintiff had maintained a GAF score of 60 for over a year and had "progressed in anger management skills so as to not express anger in ways that would create social or legal problems." Tr. at 615. In light of the inconsistency between Mr. Watson's June 2014 opinion and his other two opinions, substantial evidence supports the ALJ's decision to accord it little weight.

Substantial evidence also supports the ALJ's decision to accord some weight to the GAF score of 60 that Mr. Watson indicated in his July 2014 opinion and stated had been consistent since May 2013.   In prior cases, this court has held that GAF scores are meaningful to the claimant's functioning only at the time that they are assessed and lack meaning without additional context. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). However, the ALJ did not rely on a one-time GAF score, but noted that Mr. Watson attested to the stability of Plaintiff's GAF score over time and found that it was consistent with the general evidence of record. Tr. at 26–27. Although Plaintiff argues and the undersigned concedes that a GAF score of 60 is not necessarily inconsistent with a finding of disability in some cases, here, the ALJ cited sufficient

evidence throughout the decision to support his finding that Plaintiff had only moderate work-related limitations. Therefore, the undersigned recommends the court find the ALJ adequately considered Mr. Watson's opinions and explained his reasons for giving the June 2014 statement little weight and the July 2014 statement some weight.

c.    State Agency Consultants' Opinions

Plaintiff argues the ALJ erroneously assigned great weight to the opinions of the non-treating, non-examining state agency physicians and psychologists because they were based on an incomplete record. [ECF No. 10 at 35 and ECF No. 12 at 13–14]. The Commissioner argues the ALJ relied on the state agency consultants' opinions because they were consistent with the GAF score assessed by Mr. Watson, Dr. Cole's findings, and the evidence as a whole. [ECF No. 11 at 11–12]. She contends the ALJ did not rely on the consultants' opinions in isolation, but considered them in light of the other evidence of record. *Id.* at 12.

The ALJ accorded significant weight to the state agency consultants' opinions based on their consistency with the evidence of record and Plaintiff's general functioning. Tr. at 27. This was reasonable in light of the ALJ's earlier explanation as to how he evaluated the evidence. *See* Tr. at 21–22 and 23–27. Therefore, the undersigned recommends the court find that substantial evidence supported the ALJ's weighing of the state agency consultants' opinions.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and

law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

      IT IS SO RECOMMENDED.

January 4, 2017                     Shiva V. Hodges
Columbia, South Carolina         United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).